Upon review of the competent evidence of record with respect to the errors assigned, the Full Commission affirms the deputy commissioner's calculation of Plaintiff's average weekly wage and Plaintiff's entitlement to a period of total disability benefits, but modifies as to the length of this period of total disability, and reverses as to Defendant's obligation to pay for work simulation-conditioning or treatment at the Spinal Restoration Center at Baptist Hospital.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission, the Commission has jurisdiction of the parties and of the subject matter of this action, and that the parties are bound by the provisions of the Worker's Compensation Act.
2. All parties have been correctly designated.
3. At all time relevant hereto, and particularly on 5 November 1995, the date of the injury herein, the relationship of employee and employer existed between Marion Joyce Petty and Midland Delivery Service.
4. On 11 September 1997, Plaintiff filed a motion for approval of medical care and change of treating physician to Dr. William Bell. A Consent Order was filed on 18 November 1997.
5. Defendant terminated Plaintiff's employment on 24 September 1997.
6. Dr. William Bell examined Plaintiff on 14 October 1997 and wrote a medical note stating that Plaintiff should remain out of work. Dr. Bell prescribed various medications and therapeutic treatments for Plaintiff.
7. Defendant has not paid any temporary total disability benefits to Plaintiff.
8. Defendant stipulates to an injury by accident on 5 November 1995 which resulted in a sprain to Plaintiff's left shoulder.
9. The issues before the deputy commissioner were (1) Plaintiff's average weekly wage; (2) whether Defendant's failure to produce a properly completed Form 22 and refusal to stipulate to Plaintiff's average weekly wage were based on unfounded litigiousness; (3) whether Defendant's failure to comply with G.S. 97-18(c) and (d) constituted a waiver of Defendant's right to contest the compensability of or its liability on this claim; (4) whether Defendant's refusal to stipulate to an injury by accident as a result of the 5 November 1995 incident arising out of and in the course and scope of Plaintiff's employment with Defendant was based on unfounded litigiousness; (5) whether Plaintiff is entitled to temporary total disability compensation since 14 October 1997; (6) whether Plaintiff is entitled to continuing medical benefits as prescribed by Dr. Bell; (7) whether Defendant's rehabilitation nurse should be replaced with a rehabilitation professional appointed by the Industrial Commission; and (8) whether Plaintiff is entitled to attorney's fees based on Defendant's acts of unfounded litigiousness.
 ***********
Based upon all of the competent evidence adduced at the hearing, the undersigned makes the following additional:
 FINDINGS OF FACT
1. Plaintiff was born on 18 December 1944. She began working as a mail delivery truck driver for Defendant in 1993.
2. Plaintiff's average weekly wage was $697.60, yielding a compensation rate of $465.09. This calculation does not include the amount paid by Defendant for health insurance and pension benefits, as required by Defendant's contract with the U.S. Postal Service. Plaintiff did not have the option of accepting wages in lieu of the value of these fringe benefit, nor can the value be quantified.
3. On 5 November 1995, Plaintiff injured her left shoulder while pulling on a cart of mail which had become lodged on her truck. She promptly reported the incident to her employer, who directed her to Gary McKeel, a chiropractor to whom Defendant regularly refers injured employees.
4. Plaintiff presented to Dr. McKeel with complaints of moderate pain in her left shoulder and neck, with some numbness in the fingers of her left hand. Dr. McKeel treated Plaintiff conservatively through 25 January 1996, during which time Plaintiff continued to work without restrictions. By the time Plaintiff left Dr. McKeel's care, Dr. McKeel believed she had significantly improved with no permanent disability.
5. Due to Plaintiff's continuing complaints of pain, Defendant referred Plaintiff to orthopedic surgeon Dr. Paul Duane Harkins. On 1 February 1996, Plaintiff began treatment for neck and upper extremity pain.
6. Cervical x-rays showed some degenerative disk disease at C5-6 and an otherwise normal spine. Dr. Harkins ordered an MRI which was performed on 20 February 1996. The MRI showed a small disk protrusion at C5-6. According to the radiology report, Plaintiff had a right posterior lateral disk herniation at C5-6 with moderate to severe right foraminal narrowing and probable compression of right C5 nerve root. Dr. Harkins testified that these findings were consistent with Plaintiff's bilateral arm symptoms, and he diagnosed Plaintiff with degenerative disk disease with nerve root compression bilaterally.
7. In October 1996, Plaintiff had a fairly normal examination, with full range of motion and some complaints of pain when laterally bending her neck to the left side.
8. In February and March 1997, Plaintiff presented to Dr. Yates, Dr. Harkins' associate, and to Dr. Harkins with complaints of neck pain while driving. He ordered a second MRI and recommended that Plaintiff stop working until the MRI results were studied. Dr. Harkins acknowledged that he wrote Plaintiff out of work in part to encourage Defendant's administrator, Key Risk, to approve the MRI promptly. Nevertheless, Plaintiff continued to work.
9. A comparison of the two MRI studies showed degenerative changes and a mild broad-based annular bulge at C5-6 without herniation. However, based on Plaintiff's continuing complaints of pain, Dr. Harkins diagnosed Plaintiff with a herniated disk at C5-6 and recommended fusion surgery.
10. Plaintiff did not have the surgery. She presented to Dr. Harkins on 13 August 1997 with complaints of pain in her left arm and shoulder with numbness in her hands and fingers. She also reported pain and inflammation in her midthorax, lumbrosacral complaints, pain in the right armpit, hips, thighs, legs and feet. Because Plaintiff's complaints were then so varied and inconsistent with a disk problem, Dr. Harkins changed his recommendation for surgery. By that time, Plaintiff had also been examined by two other neurosurgeons, Dr. William Bell and Dr. Randy Kritzer, who recommended against surgery. Plaintiff was developing complaints of symptoms which were not related to the incident on 5 November 1995.
11. Dr. Harkins gave Plaintiff a ten percent permanent partial disability rating to her back. He did not believe that Plaintiff was disabled from driving trucks at any time during his treatment of her.
12. On 7 August 1996, Plaintiff presented to her general internist Dr. Steven P. Wittmer for the removal of a lesion on her left cheek. At that time Plaintiff did not discuss any other pain problems at that time.
13. Plaintiff next presented to Dr. Wittmer on 29 January 1997 with complaints of neck pain and numbness in her right upper extremity. She told Dr. Wittmer of the injury in November 1995. Dr. Wittmer saw Plaintiff again for unrelated complaints on 6 March 1997 and 21 April 1997. Plaintiff did not discuss any neck or shoulder pain at either visit.
14. On 17 June 1997 Plaintiff reported with complaints of persistent neck pain, headaches, discomfort in right upper extremity, arm and forearm, with numbness. Plaintiff told Dr. Wittmer that she had been dealing with the symptoms for the preceding eighteen months. Dr. Wittmer examined the two MRIs and found no evidence of extensive disease. He recommended that Plaintiff report to neurosurgeon Dr. William Bell. Dr. Wittmer did not take plaintiff out of work.
15. Plaintiff presented to Dr. William Bell on 3 July 1997. Following an examination, Dr. Bell diagnosed three possible explanations for Plaintiff's symptoms: (1) a soft tissue injury to the neck; (2) possible cervical radiculopathy (pinched nerve); or (3) carpal tunnel syndrome.
16. Dr. Bell disagreed with the reading of the first MRI in that he saw no foraminal narrowing. He stated that the disk bulge could account for the symptoms in Plaintiff's right arm, but not in the left. His review of the second MRI showed some evidence of degenerative disk disease and wear and tear changes at C5-6. According to Dr. Bell, the second MRI did not show any evidence of the ruptured disk seen in the first MRI, but showed a broad-based annular bulge which was typical of aging but which would not account for Plaintiff's symptoms.
17. Based on Plaintiff's complaints, Dr. Bell believed that Plaintiff had a soft tissue injury to her neck caused by the work incident on 5 November 1995. He recommended an EMG-PNCV study.
18. Dr. Bell next saw Plaintiff on 14 October 1997, after the study was completed. He testified that the results were suggestive of carpal tunnel syndrome which could be a component of the neck and upper back symptoms, but not those of the left arm. However, the carpal tunnel syndrome was not caused by Plaintiff's injury in November 1995. Dr. Bell recommended physical therapy, and wrote Plaintiff out of work until the therapy was completed. At this time, however, Plaintiff had been terminated from her job with Defendant. Defendant paid for therapy from 14 October 1997 through 25 November 1997.
19. Dr. Bell next examined Plaintiff on 25 November 1997 with no change in symptoms. He believed Plaintiff was not a candidate for surgery. Dr. Bell had no further treatment recommendations. Physical therapy had not proven to be helpful. Dr. Bell gave Plaintiff a ten percent permanent partial disability back rating and continued her out of work through 12 December 1997, at Plaintiff's request.
20. Defendant agreed to pay for a functional capacity evaluation (FCE) suggested by Dr. Bell. Plaintiff indicated that she was unable to complete the evaluation, and no job matches were established and no work restrictions were formulated. Dr. Bell also approved the work conditioning and work simulation which had been suggested at the FCE, and wrote Plaintiff out of work through 2 February 1998. However, Defendant refused to pay for further treatment. On 3 February 1998, at Plaintiff's request, Dr. Bell wrote Plaintiff out of work through 24 February 1998, the date of the hearing in this matter. Dr. Bell viewed his role as making a determination as to the necessity of surgery rather than continuing to monitor treatment, and he had exhausted his treatment options.
21. On 24 September 1997, Plaintiff was assigned to drive a truck which was dirty inside and had a wet seat due to a window being left open during a rainstorm. Plaintiff complained to her supervisor about the condition of the truck, indicated that she was going to file a discrimination charge against Defendant, then stormed out without giving the supervisor a chance to respond. The supervisor called ahead to the depot where Plaintiff was to stop and pick up her load of mail, and requested the dispatcher to instruct Plaintiff to return the vehicle. The dispatcher relayed the message to Plaintiff and Plaintiff refused to comply. Plaintiff drove away with the truck and completed her delivery. Upon her return she was informed that she was being discharged. The reason for the termination of her employment was subsequently given as insubordination.
22. Plaintiff's termination from employment was for reasons unrelated to her work-related injury of 5 November 1995.
23. Except for a few hours missed to attend doctor's appointments, Plaintiff worked as a truck driver for Defendant from the date of her injury on 5 November 1995 until she was terminated on 24 September 1997, a period of almost two years. Plaintiff did not make reasonable efforts to obtain other employment, even though she had had several truck driving positions over the years and had other job experience.
24. Plaintiff did suffer pain as a result of the shoulder and neck strain on 5 November 1995, but it is not accepted as credible that the incident of 5 November 1995 caused disabling pain or the multitude of symptoms of which Plaintiff began to complain in August 1997, or that the incident of 5 November 1995 rendered Plaintiff unable to work after 25 November 1997. It was reasonable for Plaintiff to receive physical therapy, although the therapy did not provide relief, and Defendant agreed to pay for the functional capacity evaluation. However, further treatment in the form of work conditioning/work simulation and treatment at the Spinal Restoration Clinic at Baptist Hospital are not reasonably necessary to effect a cure or give relief.
25. Defendant did not engage in unfounded litigiousness.
26. The issue regarding removal of the rehabilitation nurse assigned to Plaintiff is moot.
 ***********
The foregoing findings of fact and conclusions of law engender the following additional:
 CONCLUSIONS OF LAW
1. Plaintiff's average weekly wage was $697.60, yielding a compensation rate of $465.09. The amount paid by Defendant for health insurance and pension benefits is excluded from the calculation of Plaintiff's wages. This produces a fair result to both parties. G.S. 97-2(5); Kirk v. N.C. Dept. of Corrections,121 N.C. App. 129, 465 S.E.2d 301 (1995).
2. Plaintiff suffered an injury by accident to her left shoulder and neck on 5 November 1995. She is entitled to disability compensation from 14 October 1997 through 25 November 1997. G.S. 97-29.
3. Plaintiff is entitled to medical compensation for all treatment related to her compensable injury which is reasonably designed to effect a cure or give relief, including all appointments with Dr. Bell through the date of hearing and the physical therapy which he recommended. However, Plaintiff is not eligible for the work conditioning/work simulation or treatment at the Spinal Restoration Clinic at Baptist Hospital, as this treatment is not reasonably necessary to effect a cure or give relief. G.S. 97-25.
4. Plaintiff is entitled to a lump sum payment in the amount of $13,952.70, representing ten percent impairment rating to her back. G.S. 97-31(23).
5. A reasonable fee of 25% of the amount due Plaintiff is approved for Plaintiff's attorney.
6. Plaintiff is not entitled to an award of attorney's fees under G.S. 97-88.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Defendant shall pay Plaintiff temporary total disability compensation from 14 October 1997 through 25 November 1997. This amount shall be paid in a lump sum, subject to attorney's fees awarded to Plaintiff's attorney.
2. Defendant shall pay Plaintiff $13, 952.70 in permanent partial disability compensation. This amount shall be paid in a lump sum, subject to attorney's fees awarded to Plaintiff's attorney.
3. Defendant shall pay for all reasonably necessary medical treatment related to her compensable injury, excluding work conditioning/work simulation and treatment at the Spinal Restoration Clinic at Baptist Hospital.
4. Defendant shall deduct 25% from the amount due Plaintiff and shall pay this amount directly to Plaintiff's counsel.
5. The parties shall divide the costs of this action.
 S/_______________ RENEE C. RIGGSBEE COMMISSIONER
CONCURRING:
S/_______________ DIANNE C. SELLERS COMMISSIONER
S/___________________ BERNADINE S. BALLANCE COMMISSIONER